FILED

2007 Sep-27  PM 03:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN  DIVISION

| | | |
|---|---|---|
| **DAVID W. LANCASTER,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CIVIL ACTION NO.** |
| | ] | **2:06-CV-454-VEH** |
| **THE GUARDIAN LIFE** | ] | |
| **INSURANCE COMPANY OF** | ] | |
| **AMERICA, et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

---

## MEMORANDUM OPINION

Before the court is the motion of the Defendants, Guardian Life Insurance Company of America (hereinafter "Guardian") and Berkshire Life Insurance Company of America (hereinafter "Berkshire"), for summary judgment as to all claims asserted by the Plaintiff, David W. Lancaster (hereinafter "Plaintiff"). (doc. 11). For the reasons set forth herein, the motion is due to be **GRANTED in part and DENIED in part**.

# I.    FACTUAL AND PROCEDURAL HISTORY[1]

In November 1999, Plaintiff applied for and received disability insurance coverage by Guardian.  (AF # 3; AAF # 1).[2]  Under the policy, Guardian was to pay Plaintiff disability benefits if Plaintiff became "totally disabled"[3] while the policy was in effect and remained so for the length of the policy's ninety-day elimination period. (Def. exh. 3 pp. 4, 8-9).  The policy also provided for Plaintiff to exercise a Future Increase Option (hereinafter "FIO"), under which – even after Plaintiff became

---

[1]  These are the facts for summary judgment purposes only.  They may not be the actual facts.  See *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'")(citation omitted).  Facts are undisputed unless otherwise noted.  Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 at 1115 (11th Cir. 1993).

[2]  The designation "AF" stands for "admitted fact" and indicates a fact offered by Defendants that Plaintiff has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case. Whenever Plaintiff has adequately disputed a fact offered by Defendants, the court has accepted Plaintiff's version. The court's numbering of admitted facts (*e.g.*, AF # 1) corresponds to the numbering of Defendants' Statement of Facts as set forth in doc. # 11 and responded to by Plaintiff in doc. # 19.

Similarly, the designation "AAF" stands for "additional admitted fact" and corresponds to Plaintiff's Statement of Facts contained in doc. # 19 and responded to by Defendants in doc. # 23.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

[3]  Under the policy, "totally disabled" is defined as "not able to perform the major duties of [the insured's] occupation."  "Your occupation means the regular occupation ... in which you are engaged at the time you become disabled.  You will be totally disabled even if you are able to work in some other capacity so long as you are not able to work in your occupation."  (Def. exh. 3 pg. 8).

"totally disabled" – he could apply for an increase in his monthly disability benefits. (Id. pg. 16).

Plaintiff was self-employed when he purchased the above policy.  (AF # 2). In March 2000, Plaintiff entered employment as Director of Reimbursement for the Baptist Healthcare System in Birmingham, Alabama, a position he held until March 19, 2004.  (Pl. Dep. Vol. 1 pp. 33-36; AF # 5; AAF # 5).  Through his employment, Plaintiff acquired an additional disability insurance policy through U.S. Life.  (Pl. Dep. Vol. 1 pg. 130; AF # 5).

In August 2003, Plaintiff was diagnosed with progressive multiple sclerosis. (Pl. Dep. Vol. II pg. 14; AF # 7; AAF # 4).  Plaintiff thereafter continued working at least part time, holding the same job title as before his diagnosis.  (Pl. Dep. Vol. II pp. 11, 15-16, 36, 39, 62; AF # 7).

In November 2003, Plaintiff applied to exercise the FIO on the basis that he could no longer perform the "major duties" of his occupation.  (AF # 9).  This application was denied.  (Id.).  Plaintiff left his employment the following March, and began to receive disability benefits from Guardian ninety days later.[4]  (Compl. ¶ 8; Pl. exh. G; AF # 8).

---

[4]  As further explained *infra*, Plaintiff received benefits from Guardian based on a "total disability" date of March 2004.  (Compl. ¶ 45).

On November 1, 2004 and 2005, Plaintiff again applied to exercise the FIO, but these applications were also denied. (Compl. ¶¶ 9, 22; AF # 10). Guardian explained that Plaintiff was not eligible to exercise the FIO because, based on his previously annual earned income of approximately $120,000, Plaintiff could receive a maximum monthly benefit of $5,500. (Pl. exh. I; AF ## 9,10; AAF # 12). Because Plaintiff was already receiving a combined total monthly benefit of $5,941 from Guardian and from U.S. Life, Guardian concluded that Plaintiff could not exercise the FIO to receive more monthly benefits.[5] (Id.).

Plaintiff disputed that the policy allowed Guardian to consider the amount of monthly benefits he received from other sources, such as U.S. Life, in determining whether he could exercise the FIO. (Pl. exh. K). He repeatedly sought clarification from Guardian on this point, but alleges that Guardian was, in general, unresponsive to his inquiry. (Pl. exhs. J-O).

Plaintiff initiated this action in the Circuit Court of Jefferson County on January 27, 2006. (doc. 1, exh. A; AF # 12). He named as defendants to this action both Guardian and Berkshire, Guardian's wholly-owned subsidiary. (Id., ¶ 3). In his complaint, Plaintiff asserts claims of misrepresentation (Counts IV, V) and

---

[5] At the time he applied for the FIO, Plaintiff was already receiving $2,350 per month from Guardian and $3,491 per month from U.S. Life. (Pl. exh. I).

suppression (Count VIII), breach of contract (Count VI), bad faith (Counts I-III), and

negligence/wantonness (Count VII).  (doc. 1, exh. A ¶¶ 31-84).  On March 3, 2006,

Defendants removed the action to this court on the basis of diversity jurisdiction.[6]

_____

[6]  As a preliminary matter, the court notes that Plaintiff has not contested the propriety of removal to this court.  However, the court, as a court of limited jurisdiction, has a continuing duty to ensure that it may properly exercise jurisdiction over the cases before it.  See 28 U.S.C. § 1447(c).

For purposes of diversity jurisdiction, the court acknowledges that complete diversity of citizenship is present in this action, as Plaintiff is a citizen of Alabama, Guardian conducts its principal place of business in New York, and Berkshire in Massachusetts.  (Compl. ¶¶ 1-3).

It is less clear whether the amount in controversy requirement is also satisfied.  Where, as here, Plaintiff has not pled a specific amount of damages, Defendants must prove, by a preponderance of the evidence, that the amount in controversy exceeds $75,000 in accordance with 28 U.S.C. § 1332(a).  *See Williams v. Best Buy Co., Inc.*, 269 F.3d 1316, 1319 (11th Cir. 2001).  If it is not "facially apparent" from the Complaint that the amount in controversy more likely than not exceeds $75,000, the court may consider facts in the removal documents.  *Id.*  The court may then review the record, including any evidence submitted after the removal notice is filed.  *Id.*

In the removal notice, Defendants assert that the amount in controversy, as required consistent with *Williams*, "might well exceed" $75,000.  (doc. 1).  To support this argument, Defendants explain that Plaintiff's claims may be properly bifurcated into two prongs: (1) Plaintiff's claim for past-due benefits, based on Guardian's conclusion that Plaintiff did not become "totally disabled" until March 19, 2004, rather than August 2003; and (2) Plaintiff's claim for past due and future benefits, based on Defendants' denial of Plaintiff's FIO applications.  (See Compl. ¶ 29).

Plaintiff seeks both compensatory and punitive damages.  (doc. 1, exh. A).  If Plaintiff prevails on his claim for past-due benefits, he may be entitled to an award in the amount of $18,880.00.  (See Compl. ¶¶ 16, 27 (alleging that Plaintiff was improperly denied benefits for eight months, August 2003-March 2004, during which Plaintiff would have been entitled to receive monthly benefits in the amount of $2,350.00, had Guardian correctly determined that Plaintiff became "total disabled" in August 2003)).

If Plaintiff prevails on his claim for past-due and future FIO benefits in the amount of $1,340 per month, Plaintiff will be entitled to these benefits, under the terms of his policy with Guardian, for a total of 133 months, amounting to approximately $178,220.00.  (See Def. exh. 6; doc. 1, exhs. B, C).

(doc. 1).

## II.    STANDARD OF REVIEW

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

Based on the foregoing, the court finds that the amount in controversy "might well exceed" $75,000, and therefore it may properly exercise jurisdiction in this action. *See Williams*, 269 F.3d at 1320.

242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See *Fitzpatrick*, 2 F.3d at 1115-17, citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*).  If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party

may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the nonmoving party's case.  *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343 (1996), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

8

## III.   ANALYSIS

### 1.   Fraud

Plaintiff concedes that his claims of fraud (misrepresentation and suppression) are time-barred in accordance with the two-year statute of limitations set forth in Ala. Code 1975 § 6-2-38.  *See also Lampliter Dinner Theater, Inc. v. Liberty Mut. Ins. Co.*, 792 F.2d 1036, 1042 (11th Cir. 1986); *Fabre v. State Farm Mut. Auto. Ins. Co.*, 624 So.2d 167, 168 (Ala. 1993).

Plaintiff testified that his fraud claims arise out of a telephone conversation with his insurance broker that occurred prior to September 2003.  (Pl. Dep. Vol. 1 pp. 130-35).  Because he did not commence this action in State court until January 2006, Plaintiff's fraud claims necessarily fall short of the limitations period.  Therefore, Defendants' motion for summary judgment is due to be **GRANTED** as to these claims.

### 2.   Negligence/Wantonness

Plaintiff next alleges that Guardian negligently/wantonly failed to (1) determine Plaintiff's actual "total disability" date, and (2) issue Plaintiff the additional coverage he applied for under the FIO.

The Alabama Supreme Court "has consistently refused to recognize a cause of action for the negligent handling of insurance claims, and will not recognize a cause

of action for alleged wanton handling of insurance claims." *Kervin v. Southern Guar. Ins. Co.*, 667 So.2d 704, 706 (Ala. 1995), citing *Armstrong v. Life Ins. Co. of Virginia*, 454 So.2d 1377, 1380 (Ala. 1984), *overruled on other grounds*, *Hickox v. Stover*, 551 So.2d 259, 264 (Ala.1989).

Based on the foregoing, Plaintiff concedes that Defendants are entitled to summary judgment on his negligence/wantonness claims. Therefore, the motion for summary judgment is due to be **GRANTED** as to these claims.

### 3.    Claims against Berkshire

Plaintiff also concedes that he lacks sufficient evidence to establish that Berkshire is a party to his insurance contract with Guardian, or that Berkshire has a quasi-contractual relationship with Plaintiff.

On August 14, 2007, Plaintiff moved to continue the court's consideration of the motion for summary judgment, to enable him to gather evidence sufficient to support his claims against Berkshire. (doc. 20). The court denied the motion on the basis of Plaintiff's deficient Rule 56(f) affidavit, filed in support of the motion to continue. (docs. 20 (motion to continue), 24 (Order denying motion)).

Due to the lack of evidence as to Berkshire's liability, Plaintiff addresses only his claims against Guardian in his opposition to summary judgment. (Pl's Opp Br. pg. 22). Therefore, based on Plaintiff's concession that he has offered insufficient

evidence to support his claims against Berkshire, summary judgment is due to be **GRANTED** as to all such claims.

The only remaining claims against Guardian are (I) breach of contract, and (II) bad faith.

### 4.    BREACH OF CONTRACT

Plaintiff alleges that Guardian breached its insurance policy with him by (1) failing to properly determine the date upon which he became "totally disabled," and (2) refusing to allow Plaintiff to exercise the FIO.

To establish a prima facie case for breach of contract, Plaintiff must demonstrate (1) the existence of a valid contract between himself and Guardian; (2) that Plaintiff performed his obligations under that contract; (3) that Guardian failed to perform its obligations under the contract; and (4) that Plaintiff suffered damages therefor.  *See State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 303 (Ala. 1999); *Southern Med. Health Sys., Inc. v. Vaughn*, 669 So.2d 98, 99 (Ala. 1995); *Sullivan v. Eastern Health System, Inc.*, 953 So.2d 355, 359 (Ala. 2006).

### A.    Plaintiff's "total disability" date

Guardian does not dispute that a valid contract exists between itself and Plaintiff.   Likewise, no dispute appears as to whether Plaintiff performed his obligations under that contract, or that Plaintiff has suffered damages due to

Guardian's determination that Plaintiff did not become "totally disabled" until March 2004.

Guardian disputes, however, that it has failed to perform its obligations under the policy.  On the contrary, Guardian asserts that it properly concluded that Plaintiff did not become "totally disabled" until March 2004, and therefore, Plaintiff was not entitled to disability benefits before that date.

Plaintiff's insurance policy provides in relevant part:

Total disability means that, because of sickness or injury, you [the insured] are <u>not able to perform the major duties of your occupation</u>. Your occupation means the regular occupation (or occupations, if more than one) in which you are engaged at the time you become disabled.

You will be totally disabled even if you are at work in some other capacity <u>so long as you are not able to work in your occupation</u>.

*****

When you are totally disabled [Guardian] will pay the monthly indemnity as follows:

• You must become totally disabled while this policy is in force.
• <u>You must remain so disabled for the length of the elimination period</u>.  No indemnity is payable during that period.
• After that, monthly indemnity will be payable at the end of each month while you are totally disabled.

(Def. exh. 3 pg. 8) (emphasis added).

Plaintiff avers that he became "totally disabled" in August 2003, when he was

diagnosed with multiple sclerosis.  (AF # 7).  He continued working intermittently, however, on days when he was not receiving treatment for his illness, until March 2004.  (Pl. Dep. Vol. II pp. 34-36).   On days when he missed work to receive treatment, his supervisor assumed the "major duties" of Plaintiff's job.  (Pl. exh. H).

Guardian responds that, because he was able to perform his "major [job] duties" at least part-time until March 19, 2004, Plaintiff was not "totally disabled" before that date.  (See AAF #3; Pl Dep. Vol. II pg. 10).

According to Plaintiff, Guardian misapplies the term "totally disabled" to conclude that he must not be employed at all to be entitled to benefits under the policy.  However, Guardian does not argue that Plaintiff could not be "totally disabled" while he was employed, but that Plaintiff could not have been "totally disabled" while he was still capable of performing any of his major job duties at least some of the time.

The record establishes that Plaintiff missed a significant number of work days to receive treatment for his illness.  (Pl. exh. H).  However, as indicated *supra*, he continued working in his position three days per week through much of this period. (Id.).  Plaintiff testified that, while he could not remember a specific date, he wholly abandoned his major job duties around January 2004 to perform special projects that were less demanding.  (Pl. Dep. Vol. II pg. 63-64).

13

Such evidence indicates that Plaintiff <u>may</u> have been "totally disabled" before March 2004.  In a letter from his employer, Mr. Gregory D. Johnson, Vice President of Finance with Baptist Health System, Inc, explains that

> [Plaintiff] went on intermittent FMLA on August 9, 2003.  [ ]  [O]ur plan was for him to work on Mondays, Wednesdays, and Fridays.  [ ] [Plaintiff] tried hard to keep this schedule, but <u>there were days he just simply could not complete his responsibilities.</u>  [ ]  Since [Plaintiff] was unable to provide the management oversight, <u>it was necessary for me to take over the management of his department, assuming the major responsibilities of his job.</u>  For the period August 9, 2003 through March 19, 2004, [Plaintiff's] role was changed to one of completion of special projects.

(Pl. exh. H) (emphasis added).

While this letter points to the conclusion that Plaintiff was "totally disabled" as of August 2003, however, other evidence of record demonstrates that Plaintiff's job performance was less drastically impacted by his illness than the letter indicates. For example, Plaintiff testified as follows:

> Q:   The day-to-day duties that you had, did you perform those in August of 2003?
>
> A:   <u>On the days that I was there, I did</u>.  I know there were a lot of cases where I would find out about things that had come up on the days that I wasn't there that my boss had to take care of that [ ] I was sort of in the dark.  I felt like [ ] I should have known about it.  But there were a lot of things that [ ] <u>I just wasn't there</u>, so I couldn't be involved in depth like I should have.
>                                          ******
> Q:   And on the days you would work, would people bring you up to speed on what had happened during your absence?

14

A:     I mean, we didn't have any formal sit-down and report type thing. But you know, just in the course of work [ ] I would be informed about things.

******

Q:     [Looking at Plaintiff's job description,] [i]t says, 'Directs and manages overall reimbursement and managed care contracting activities of Baptist Health Systems, Inc. requiring effective communication and coordination with BHS management, government agencies, and private industry.' [ ] Did you maintain that overall responsibility from August of '03 until March of '04?

A:     Not completely.  And again, <u>because of my absence</u>, [ ] not being there, [ ] a lot of this stuff, <u>if</u> I wasn't there to do it, my boss would, [ ] have to be the one that did it.

Q:     Well, did you undertake any of the duties relative to that general statement?

A:     <u>When I was there, yeah</u>.

Q:     Did you still consider yourself responsible for those duties?

A:     Not to the extent that I was before.

Q:     To any extent?

A:     It was more my boss understood, [ ] my condition, and was clear that she wanted me to do as much as I could.  But whatever – [ ] if I couldn't, then, [ ] she would take care of it, so.

******

Q:     [Plaintiff's job description also provides that Plaintiff will] treat guests, patients, physicians, and employees with care, courtesy, and respect.   I assume you could still undertake that responsibility?

A:     <u>It was a little harder</u>. [T]he medication that I was on, you know, I really felt bad.  [ ]  [A]ll the time I [ ] just didn't feel good.

Q:     Well, could you recall any instances from August of '03 to March of '04 where you weren't courteous or showed respect?

A:     I don't recall any instances.

Q:     [Plaintiff's job description continues that Plaintiff] is going to direct the overall reimbursement activities of BHS to include coordination with corporate hospital management.   Did you continue to do that from August of '03 to March of '04?

A:     To some extent.  To a lesser extent than I did before.

15

******

Q:      Were you still managing your staff from August of '03 through March of '04?

A:      Again, I was not there all the time, so on a day-to-day basis I was not.  I was – [ ] on the days I was there, I was managing them.  On the days I wasn't there, it fell on my boss.

Q:      If somebody needed to take time off or couldn't get to a project, would they still have to clear that with you?

A:      They would have done that.  My boss would have handled that if I wasn't there.

Q:      Okay.  How about the days that you were there, would you have handled it?

A:      Yeah.

******

Q:      [Plaintiff's job description also provides that Plaintiff must] negotiate settlements, adjustments, and cash advances with third party payors.  Did you have to negotiate any of those three from August of '03 until March of '04?

A:      I don't specifically remember anything.   But there's a good chance that I did.

******

Q:      If something had been messed up [by a member of Plaintiff's staff], from August of '03 to March of '04, would you have gotten a phone call?

A:      If there was a fire and I was there, I would have put it out.  If I wasn't there, my boss would put it out.

******

Q:      At any point in August of '03 to March of '04, were you asked to review your responsibilities and come up with new responsibilities for the position?

A:      I don't recall anything like that.

Q:      [I]s it a fair statement to say that from August of '03 until March of '04, you remained a full-time employee of Baptist Health Systems?

A:      Yes.

Q:      Is it a fair statement that your job title did not change during this period of time?

A:     Yes.

Q:     Is it a fair statement that your job description [ ] did not change during that period of time?

A:     Job description did not change.

Q:     And as I understand your testimony today, you were able to perform certain aspects of that job description during the days that you were at work but unable to perform them on the days when you were not there?

A:     That's correct.

(Pl. Dep. Vol. II pp. 43-63) (emphasis added).

Furthermore, on his application to begin receiving benefits, filed on May 4, 2004, Plaintiff indicated that he became totally unable to work in his occupation in March 2004, not August 2003.  (Pl. Dep. Vol. II. pp. 65-66; AAF # 5).  His treating physician, Dr. Russell, also indicated on the application that Plaintiff was "totally unable" to perform his work after March 19, 2004.  (Pl. Dep. Vol. II pg. 68).  Plaintiff and Dr. Russell both indicated that Plaintiff was only "partially unable to work" beginning in August 2003.  (Id. at 66, 68).  However, Plaintiff testified that he did not understand the difference between "partially disabled" and Guardian's definition of "totally disabled," and explained that he was "partially disabled" prior to March 2004 only because he was still working part-time.  (Id. at 67).

The record, therefore, reflects that, on the days when Plaintiff could work, he was able to perform at least some of his major job duties.  Guardian takes this evidence to indicate that Plaintiff was not "totally disabled" during this period,

because he could still perform these duties on those days.  However, the policy does not provide that an insured must be unable to perform <u>any</u> of his or her major job duties to be "totally disabled."  As defined by the policy, "totally disabled" provides only that an insured must be "not able" to perform his or her "major [job] duties." (Def. exh. 3 pg. 8).  Such language at least implies that an insured could be "totally disabled" even if he or she can still perform <u>some</u> of these duties.  Therefore, Guardian's interpretation of "totally disabled" is not supported by the language in the policy.

It is unclear from the record exactly when Plaintiff became "totally disabled" as defined by the policy.  Hence, a genuine issue of material fact remains as to when Plaintiff became entitled to receive disability benefits from Guardian.  Therefore, the motion for summary judgment as to this claim is due to be **DENIED**.

### B.   Plaintiff's FIO Applications

Plaintiff next argues that Guardian breached its contract with him by refusing to allow him to exercise the FIO provided for in the insurance policy.

The only dispute as to this claim is whether Guardian performed its obligations under the contract.  According to Plaintiff, the policy enabled him to exercise the FIO <u>at his option</u>.  (Def. exh. 3 pg. 16).  As explained *supra*, Plaintiff first attempted to exercise this option on November 1, 2003, and again on November 1, 2004 and 2005.

(AF ## 9, 10).  Each application was denied on the basis that Plaintiff did not satisfy the income requirements to exercise the FIO.  (Def. exh. 10).

The FIO was provided for by an FIO rider that accompanied Plaintiff's insurance policy.  (Def. exh. 3 pg. 16).  The rider provides, in relevant part, that

> This rider gives you [the insured] the right to buy more disability income insurance in future years in spite of any change in your health or occupation.  We [Guardian] call the added insurance an increase option.
>
> The increase option will be issued on a separate policy form which is most like this policy then in use in the place where you live, or at our choice, will be added to this policy.
>
> The total increase option is shown in the schedule page.  This is the maximum amount of monthly indemnity which you may buy under this rider on all option dates combined.  Your option date each year is the policy anniversary.
>
> ******
>
> We will allow you to exercise an increase option when you are disabled under this policy on an option date.  The increase option will take effect immediately for the disability that exists on the option date.  We will deem that you were first disabled on the date of issue of the increase option.  You will then have to satisfy all conditions of the policy for payment of benefits, including any elimination period.
>
> Your earned income for purposes of the increase option will be deemed to be your rate of earnings just before you became disabled under this policy.
>
> ******
>
> **Conditions and Limitations**

19

******

- You do not have to give evidence of good health.  But you must give us details of your income, employment, and other insurance in force.
- The monthly indemnity of the increase option [ ] may not exceed our published income rules for new insureds.

(Def. exh. 4 pp. 2-3).

As discussed *supra*, in denying Plaintiff's FIO applications, Guardian avers that Plaintiff was entitled to receive $5,550 in maximum monthly benefits based on his earned income at the time he became "totally disabled." (Def. exh. 10; Pl's Dep. Vol. I, pg. 99-100, 117; AF # 10).  When he applied to exercise the FIO in 2003, Plaintiff testified that Guardian denied his application because his income, which then included income earned through his employment and benefits he received from U.S. Life, exceeded his maximum allowable benefits per month.  (Pl. Dep. Vol. I, pg. 99-100).  When he attempted to exercise his FIO in 2004 and 2005, Guardian again rejected the applications because, while he was no longer employed at those times, Plaintiff was still receiving more than his maximum allowable benefits, due to his combined monthly benefits received from U.S. Life and through his policy with Guardian, without exercising the FIO.[7]  (Pl. Dep. Vol I, pg. 117, AF ## 9, 10; Def.

_____

[7] Def. exh. 10 reflects that, at least as of May 2005, Plaintiff was receiving $2,450 from Guardian per month and $3,491 from U.S. Life per month.  Plaintiff was therefore receiving $5,941 per month of combined monthly benefits from Guardian and U.S. Life.  It is not clear

exh. 10).  Therefore, Guardian avers, it did not breach its contract with Plaintiff by refusing to allow him to exercise the FIO.

Plaintiff does not dispute that the amount of benefits he could obtain under the FIO depends on his <u>income</u> level.  (See Pl's Opp. Br. pg. 2 n. 1).  Plaintiff argues, however, that Guardian was not entitled to consider the amount of <u>benefits</u> he received from U.S. Life to determine whether he could exercise the FIO.

Guardian responds that the policy "expressly" allows it to consider Plaintiff's income "from all sources" in accepting or declining his FIO application.  However, Guardian has failed to direct the court to any language[8] that allows it, "expressly" or otherwise, to consider <u>benefits</u> he received from other sources in accepting or rejecting his FIO claim.  Nor does Guardian direct the court to any language[9] defining "income" as including "benefits."  Moreover, the language to which Guardian points the court, a set of Issue and Participation Limits (hereinafter "I & P Limits"), provides only the maximum amount of monthly benefits to which Plaintiff is entitled.  (Def. exh. 10 pg. 3).  While the I&P Limits tie maximum benefits that Guardian will issue

---

from the record why, if Guardian believed that Plaintiff was not entitled to receive more than $5,550 per month of <u>total monthly benefits</u>, Guardian allowed Plaintiff to receive benefits that placed him in excess of this amount, even without exercising the FIO.

[8]  And the court could not find any.

[9]  And the court could not find any.

to the "<u>annual income</u>" of an applicant, the court finds in the I&P Limits no explanation at all as to what sources of <u>benefits</u> may or may not be considered by Guardian.

Plaintiff appears to argue that the only benefits Guardian could properly consider were the benefits he was already receiving from Guardian. The court agrees. Guardian points to no language in the contract, nor has the court discovered any, that entitles it to consider the amount of benefits Plaintiff receives from other disability insurers in determining whether Plaintiff may increase the amount of benefits payable to him by Guardian. On the contrary, Guardian's own definition of "monthly indemnity" provides that "[t]he monthly indemnity is shown in the schedule page. It is the amount <u>we</u> [Guardian] <u>will pay</u> for each month of total disability." (Def. exh. 3 pg. 9) (emphasis added). Significantly, "monthly indemnity" is not defined as the amount <u>Plaintiff</u> may <u>receive</u>, but the amount <u>Guardian</u> will <u>pay</u>, with no stipulation regarding the benefits Plaintiff receives from other sources. However, the FIO rider provides that "[t]he increase option is shown <u>in the schedule page</u>. This is the maximum amount of <u>monthly indemnity</u> [payable by Guardian] which you [Plaintiff] <u>may buy</u>." (Def. exh. 3 pg. 16) (emphasis added). Based on this language, the FIO allows Plaintiff to buy the maximum amount of benefits that Guardian will pay, up to the amount shown in the I & P Limits, or $5,550 per month. (Def. exh. 10).

"If a court determines that an insurance contract is ambiguous, it will resolve the ambiguity in favor of the insured." *Cannon By and Through Cannon v. State Farm Mut. Auto. Ins. Co.*, 590 So.2d 191, 194 (Ala. 1991), citing *Altiere v. Blue Cross & Blue Shield of Alabama*, 551 So.2d 290, 292 (Ala.1989).   Where no ambiguity exists, an insurance contract will be enforced as written.   *Id.*, citing *Monninger v. Group Ins. Service Center, Inc.*, 494 So.2d 41 (Ala.1986).   The court finds no ambiguity in the language of the policy.   As written, Guardian is not entitled to consider Plaintiff's benefits from other disability insurers.   By expressly so considering, Guardian has failed to perform its obligations under the policy and has therefore breached its contract with Plaintiff.   Therefore, the motion for summary judgment on this claim is to due to be **DENIED**.   Furthermore, **JUDGMENT** is due to be **GRANTED** to Plaintiff on this claim.[10]

---

[10]   In *Pollock v. Birmingham Trust Nat. Bank*, 650 F.2d 807 (5th Cir. 1981), the former Fifth Circuit explained the circumstance in which a district court may grant summary judgment to a nonmoving party.   While the court did not have occasion to rule directly on the issue, it explained that

> The great weight of authority, and of our own authority by direct implication, supports the existence of such a power.   Moore's Federal Practice, P 56.12; Wright & Miller, Federal Practice and Procedure: Civil s 2716, at n. 7; and *Black Warrior Electric Membership Corp. v. Mississippi Power Co.*, 413 F.2d 1221 (5th Cir. 1969).   But wherever the power has been admitted to exist, it has been attended with the most important qualification: Absent an otherwise effective abandonment, the party against whom judgment is rendered must not be foreclosed from litigating issues of fact material to any surviving claims. Prof. Moore makes explicit what is otherwise assumed whenever summary judgment is granted:

## 5.    BAD FAITH[11]

Care should, of course, be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law.

Moore's Federal Practice, P 56.12, at 56-334.

*Pollock*, 650 F.2d at 810.

Having fully briefed the issue, Guardian has not been foreclosed from litigating any issues of material fact relating to Plaintiff's breach of contract claim based on his FIO applications. On the contrary, Guardian has agreed that Plaintiff's claim arises solely out of the language of the policy, which the court has found does not entitle Guardian to deny Plaintiff's FIO application on the basis of benefits he receives from another disability insurer. Consequently, summary judgment in favor of Plaintiff is proper as to this claim.

*See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

[11]  Before addressing the merits of Plaintiff's bad faith claims, the court acknowledges Guardian's argument that these claims are time-barred. Guardian cites to a provision of the Alabama Code, § 2-38, which the court is unable to find and can only assume is the result of a typographical error. However, Guardian avers, and the court agrees, that the statute of limitations on bad faith claims is two years. *See ALFA Mut. Ins. Co. v. Smith* 540 So.2d 691, 692 (Ala. 1988), citing to Ala.Code 1975, § 6-2-38( 1 ); *McLeod v. Life of the South Ins. Co.*, 703 So.2d 362, 364 (Ala.Civ.App. 1996), citing *ALFA*, 540 So.2d at 692-93. According to Guardian, because Plaintiff first attempted to exercise the FIO by telephoning his insurance broker during the fall of 2003, Plaintiff received notice that it would deny his FIO applications during that time period, more than two years prior to commencing this action in January 2006. (Pl. Dep. Vol. I pg. 99).

The court notes that, in his Complaint, Plaintiff does not specifically assert bad faith claims relating to his attempt to exercise the FIO in 2003. Furthermore, in his opposition to summary judgment, Plaintiff makes no reference to any claims arising out of his 2003 attempt to exercise the FIO. On the contrary, Plaintiff's argument is his attempts, in 2004 and 2005 to exercise his FIO benefit. (See Pl's Opp. Br. pp. 41-42). Therefore, although the court agrees that any bad faith claim arising more than two years prior to this action is time-barred, the court finds no basis to conclude that Plaintiff's bad faith claims based on his 2004 and 2005 attempts to exercise his FIO are time-barred simply because he first attempted to exercise the FIO in 2003. Plaintiff continued to pay the premium for his FIO benefit. His right to exercise it was an annual right.

Plaintiff next asserts three separate claims of bad faith against Guardian, based on its failure to (1) pay disability benefits according to Plaintiff's "total disability" date of August 2003; (2) allow Plaintiff to exercise the FIO; and (3) investigate (a) Plaintiff's claim for benefits according to his "total disability" date of August 2003, and (b) Plaintiff's contractual right to exercise the FIO before "arbitrarily deny[ing] it."

When considering a claim for bad faith refusal to pay insurance benefits, the Alabama Supreme Court has held that "[a]n insurer is liable for its refusal to pay a direct claim when there is no lawful basis for the refusal coupled with actual knowledge of that fact." *National Security Fire & Cas. Co. v. Bowen*, 417 So.2d 179, 183 (Ala. 1982), citing *Chavers v. National Security Fire & Cas. Co.*, 405 So.2d 1 (Ala. 1981). "No lawful basis 'means that the insurer lacks a legitimate or arguable reason for failing to pay the claim.'" *Bowen*, 417 So.2d at 183, quoting *Gulf Atlantic Life Ins. Co. v. Barnes*, 405 So.2d 916, 924 (Ala. 1981).

"The plaintiff in a 'bad faith refusal' case has the burden of proving:

(a) "an insurance contract between the parties and a breach thereof by the defendant;
(b) "an intentional refusal to pay the insured's claim;
(c) "the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

---

Each denial was a separate act by Guardian, starting a new statue of limitations period.

> (d) "the insurer's actual knowledge of the absence of any legitimate or arguable reason;
> (e) "if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."

*National Ins. Ass'n v. Sockwell*, 829 So.2d 111, 127 (Ala. 2002), quoting *Bowen* at

183.[12]

> "In short, plaintiff must go beyond a mere showing of nonpayment and prove a *bad faith* nonpayment, a nonpayment without any reasonable ground for dispute.  Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim."

*Sockwell* at 127, quoting *Bowen* at 183 (emphasis in original).

## 1.    Plaintiff's FIO claims

Guardian first argues that Plaintiff cannot prevail on his bad faith claims relating to his attempts to exercise his FIO because such claims are not recognized by Alabama courts.   Alabama courts appear to recognize bad faith claims against insurers only in the claims context.  *See Shelter Mut. Ins. Co. v. Barton*, 822 So.2d 1149, 1154 (Ala. 2001), citing *Chavers v. National Sec. Fire & Cas. Co.*, 405 So.2d

---

[12]   In *Employees' Benefit Ass'n v. Grissett*, 732 So.2d 968, 976-977 (Ala. 1998), the Alabama Supreme Court explained that elements (a) through (d) represent one standard of proof for a bad faith claim, while element (e) represents a second.  While the first standard of proof requires Plaintiff to prove that he is entitled to judgment as a matter of law as to his breach of contract claim, he must also prove that Guardian had <u>actual knowledge</u> that it lacked any legitimate or arguable reason to (1) determine that Plaintiff did not become "totally disabled" until March 2004, and (2) deny Plaintiff's FIO claims.  *See Grissett*, 732 So.2d at 977.

1 (Ala. 1981).  Guardian submits that Plaintiff's claims relating to the FIO are based on its refusal to issue <u>additional</u> coverage, not its failure to pay a claim under an existing policy.  Therefore, asserts Guardian, Plaintiff's bad faith claims relating to the FIO must fail.

To support this argument, Guardian points to various provisions in the FIO rider and other evidence of record, all of which indicate that approval of Plaintiff's FIO would have resulted in the creation of a new policy.  For example, the FIO rider explains that, if Plaintiff chooses to apply for the additional coverage and Guardian approves such application, "[t]he increase option will be issued on a <u>separate policy form</u> which is most like this policy then in use [ ] <u>or, at [Guardian's] choice, will be added to this policy</u>."  (Def. exh. 4 pg. 2) (emphasis added).

Furthermore, before the FIO could be exercised, Plaintiff would "have to satisfy all conditions of the policy for payment of benefits, including any elimination period."  (Def. exh. 4 pg. 2).  Therefore, while Plaintiff had already satisfied "all conditions . . . including any elimination period" to receive benefits under his <u>existing</u> policy, the FIO rider contemplates that an entirely new set of conditions and stipulations would arise out of Plaintiff's exercise of the FIO, as would be the case for any new policy written between Plaintiff and Guardian.

The rider also provides the following terms:

27

- "The monthly indemnity for the increase option, including any SIS benefit, may not exceed our published income rules for <u>new insureds</u>." (Def. exh. 4 pg. 3) (emphasis added).

- "The increase option may include any residual disability benefit or cost of living benefit that is part of this policy if we are then offering such benefits <u>to new insureds</u>." (Id.) (emphasis added).

- "The increase option cannot have a shorter elimination period or longer benefit period than this policy." (Id.) (emphasis added).

Plaintiff's FIO application also indicates that a new policy would have been created if the application was approved. (See Pl. exh. R). The application refers to the applicant as the "proposed insured," and provides further that:

- "Premium notice on the <u>new policy</u> will be sent to the same person as under the policy to which the . . . FIO . . . being exercised is attached, unless otherwise indicated." (Id. at lines 1, 8) (emphasis added).

- The application further requests the applicant to indicate the total amount of indemnity to be provided by the "<u>new policy</u>." (Id. at line 12) (emphasis added).

- "If [the proposed insured's] original policy has any of the following benefits, select those [the insured] want[s] to continue under the <u>new policy</u>." (Id. at ¶ 13a) (emphasis added).

- "Adding a benefit under the <u>new policy</u> will require underwriting." (Id. at ¶ 13b) (emphasis added).

- "It is understood and agreed as follows: The statement and answers made [in this application] are true and complete and correctly recorded. The company may rely on them to determine the outcome, if any, of insurance it will issue and they shall form a part of <u>the contract of insurance if issued</u>." (Id. pg. 2) (emphasis added).

28

Regardless of whether a new policy would have been created <u>had</u> his FIO claims been accepted, the court finds that Plaintiff's bad faith claims relating to the FIO arise out of his <u>right to apply</u> to exercise the FIO, which arose out of the <u>existing</u> policy. Meanwhile, Guardian cites to no cases in support of its position that, where an <u>existing</u> policy is in place, the insurer cannot be liable for its bad faith refusal to issue coverage under that policy – particularly where the insurer's stated reason for so refusing is not supported by any language in the existing policy. Therefore, Plaintiff's bad faith claims relating to the FIO do not fail simply because they contemplate the issuance of new coverage.

Turning to the merits of Plaintiff's FIO bad faith claims, Alabama recognizes two avenues by which Plaintiff may prevail on these claims. First, as discussed *supra*, Plaintiff may establish that he is entitled to judgment as a matter of law on his breach of contract claim. *See Loyal American Life Ins. Co., Inc. v. Mattiace*, 679 So.2d 229, 235 (Ala. 1996) ("In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law."). "Further, the trial court need not expressly direct a verdict in favor of the plaintiff on a breach of

contract claim in order to submit a bad faith claim to the jury. The trial court must simply determine that the plaintiff has met the standard of proof required for a directed verdict."

*Id.* at 235 n. 2.

As to the second standard of proof, the court explained that

[e]ven if an insured is not entitled to a directed verdict on the contract claim, the bad faith claim can be submitted to the jury <u>if the insurer recklessly or intentionally fails to properly investigate a claim or subject the results of the investigation to a cognitive evaluation and review</u>. *Blackburn v. Fidelity & Deposit Co. of Maryland*, 667 So.2d 661 (Ala.1995); *Thomas v. Principal Financial Group*, 566 So.2d 735 (Ala.1990).

*Id.* (emphasis added).

Plaintiff argues that Guardian's Motion for Summary Judgment fails under either standard of proof. Because the court finds that summary judgment is due to be denied under the first standard, it does not address the second.

As to the first element of this standard, the court previously found that Plaintiff is entitled to a directed verdict on his breach of contract claim relating to Guardian's denial of his FIO claims. Furthermore, the Guardian's denial of these claims was admittedly intentional, thus satisfying the second element of Plaintiff's bad faith claim. As to the third element, the court finds that Guardian lacked any colorable basis for denying the claims, as its stated reason for the denials is wholly unsupported

30

by the language of the policy.

However, a question of fact remains as to whether Guardian had <u>actual</u> knowledge that it lacked any arguable reason for denying the claims. Guardian's only stated reason for the denials is, as explained, unsupported by the language of the policy. Guardian also never fully explained to Plaintiff, despite his numerous inquiries, how the policy language supports its rejection. However, while the court might <u>infer</u> from such evidence that Guardian had actual knowledge, the evidence falls short of actually proving Guardian had such knowledge.

Therefore, having found a genuine issue of material fact as to whether Guardian's denial of the FIO claims was in bad faith, the motion for summary judgment is due to be **DENIED** as to these claims.

The court turns next to Plaintiff's claim that Guardian failed to investigate the merits of his FIO claims. Due to the lack of policy language supporting its stated reason for denying the claims, and the fact that Guardian never adequately explained how its stated reason is supported by the language of the policy, Guardian has not met its burden of demonstrating the absence of a genuine issue of material fact on this issue. Consequently, the motion for summary judgment as to this claim is also due to be **DENIED.**

### 2. Plaintiff's "total disability" date

31

Plaintiff next asserts bad faith claims based on Guardian's (a) failure to properly determine Plaintiff's "total disability" date, and (b) failure to investigate Plaintiff's claim that he became "totally disabled" in August 2003, and not March 2004.

As explained in part 5(1) of this analysis, Alabama courts recognize two standards of proof for a bad faith claim in the insurance context.  As to the first standard, the court has concluded that a question of material fact remains as to when Plaintiff actually became "totally disabled" as defined by the policy.  Therefore, Plaintiff is not entitled to a directed verdict on his breach of contract claim relating to his "total disability" date, and hence cannot satisfy the first standard of proof for his bad faith claim.

Plaintiff has also failed to meet his burden under the second standard of proof.  Plaintiff offers no evidence, aside from the policy language, that Guardian intentionally or recklessly failed to investigate Plaintiff's "total disability" date.  The record indicates that Plaintiff could perform at least some of his major job duties on some days, but not on others.  Meanwhile, the record contains no evidence that Guardian did not at least investigate this information in determining when Plaintiff became "totally disabled."  Without further evidence, the court finds that the motion for summary judgment is due to be **GRANTED** as to both claims of bad faith relating

to Guardian's determination of Plaintiff's "total disability" date.

## IV.   CONCLUSION

Based on the foregoing, the motion for summary judgment is due to be **GRANTED** as to Plaintiff's claims of misrepresentation, suppression, negligence, and wantonness.  The motion is also due to be **GRANTED** as to all claims asserted against Berkshire.  Finally, the motion is due to be **GRANTED** as to Plaintiff's claims of bad faith relating to Guardian's determination and investigation of his "total disability" date.

The motion for summary judgment is due to be **DENIED** as to Plaintiff's claims for breach of contract and bad faith relating to Plaintiff's 2004 and 2005 FIO claims.  The motion for summary judgment is also due to be **DENIED** as to Plaintiff's claim for breach of contract relating to Guardian's determination of Plaintiff's "total disability" date.

Furthermore, as to Plaintiff's breach of contract claim arising from Guardian's denial of his FIO benefits, summary judgment is due to be **GRANTED** to Plaintiff.

A separate Order will be entered.

**DONE** this the 27th day of September, 2007.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

33